JOAN W., Plaintiff-Appellee,

v.

CITY OF CHICAGO, a municipal corporation, Defendant-Appellant.

No. 84–2060.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1985.

Decided Aug. 26, 1985.

As Corrected Oct. 7, 1985.

---

R. Peter Carey, Mandel, Lipton & Stevenson, Chicago, Ill., for plaintiff-appellee.

Lynn K. Mitchell, Asst. Corp. Counsel, Chicago, Ill., for defendant-appellant.

Before ESCHBACH and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

This is an appeal from a judgment against the City of Chicago in a Section 1983 suit, 42 U.S.C. § 1983, brought by a person identified for purposes of the suit as "Joan W." At the close of a trial in which liability was conceded, the jury awarded $112,000 in compensatory damages. The district court denied a motion for judgment N.O.V. The City urges that we grant a new trial or, alternatively, a remittitur of damages.

Two issues are presented on appeal: (1) did plaintiff's appeals to the jurors in closing argument to imagine themselves in plaintiff's position constitute reversible error; (2) was the jury's award of $112,000 to compensate Joan for an illegal strip search by City police so grossly excessive as to justify a new trial or a remittitur.

We hold that counsel's closing argument, although improper, does not warrant a reversal. We do, however, hold that the damage award is so excessive as to justify our directing a remittitur.

I

Joan, a physician in her mid-thirties practicing in Chicago, was arrested for a traffic violation on January 28, 1978. Pursuant to a City policy that was subsequently declared unconstitutional by this court, *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983), five female police department employees ("the matrons"), strip searched her.

During the search, Joan was forced to remove her clothing and to expose the vaginal and anal areas of her body. The matrons threatened her when she initially refused to comply, used vulgar language, and laughed at her. Joan testified that the incident caused her emotional distress that manifested itself in reduced socializing, poor work performance, paranoia, suicidal feelings, depression, and an inability to dis-

robe in any place other than a closet. She introduced evidence tending to show that she was peculiarly sensitive to the kind of physical violation she had endured because she was a private person who even during high school gym classes could not completely disrobe in front of others and was conscious of her physical disabilities caused by her chronic arthritis.

The City conceded liability but introduced evidence tending to show that Joan suffered no sexual dysfunction or significant decline in work effectiveness as a result of the incident.

## II

The City's first assignment of error is the alleged prejudicial remarks made by Joan's counsel during closing argument. In rebutting the City's theory that Joan's emotional injuries were insignificant because she had not told various people about the incident, counsel asked, "Would you tell them if they asked you if that had happened to you?" The City did not object to this statement. After the City finished its closing argument, Joan's counsel again addressed the issue of Joan's reticence about the incident by asking the jury, "How would you feel?" The City objected. The judge overruled the objection, and counsel again asked the jury, "How would you feel if you had been taken into a cell and over your repeated protestations you had been forced to undress and do the things that Joan did?"

■ An appeal to the jury to imagine itself in the plaintiff's position is impermissible because it encourages the jury to depart from its neutral role. *Spray-Rite Services Corp. v. Monsanto Co.*, 684 F.2d 1226, 1246 (7th Cir.1982), *aff'd*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). This so-called "Golden Rule" argument has been universally condemned by the courts. *Id.* Joan nevertheless urges three reasons for affirming. First, Joan contends that any objections to the Golden Rule argument were waived by lack of contemporaneous objection. The City did, however, object to the second Golden Rule argument,

and this court has recognized that reiterative objections are unnecessary to preserve an objection for appeal. *Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland*, 202 F.2d 794, 800–01 (7th Cir. 1953); *cf. Brown v. Walter*, 62 F.2d 798, 800 (2d Cir.1933) (Hand, J.) ("often the protest will only serve to emphasize the evil").

Second, Joan urges that the Golden Rule argument is not objectionable when it refers only to the assessment of credibility. There is no reason for such a distinction because the jury's departure from its neutral role is equally inappropriate regardless of the issue at stake.

■ Third, Joan appears to contend that its Golden Rule argument was somehow invited by the City's contention that Joan really did not feel all that badly about the incident. Although otherwise impermissible remarks may be sustained as invited by opposing counsel's prior impermissible remarks in closing argument, *see United States v. West*, 670 F.2d 675, 688–90 (7th Cir.), *cert. denied*, 457 U.S. 1124, 1139, 102 S.Ct. 2944, 2972, 73 L.Ed.2d 1340, 1359 (1982), there was nothing impermissible about the City's contention. Accordingly, Joan's counsel did not have license under the "invited response" doctrine to retaliate with impermissible remarks of her own.

■ Nevertheless, counsel's Golden Rule argument should not be held reversible error. Although the remarks were clearly improper, the relevant inquiry is not whether they were improper but whether the district court's response, or lack of response, to the remarks was a prejudicial abuse of discretion. *Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 197 (4th Cir.1982), *cert. denied*, 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983); *accord Shroyer v. Kaufmann*, 426 F.2d 1032, 1034 (7th Cir.1970). "Naturally, in reviewing questions concerning remarks alleged to have misled the jury, we give great weight to the district judge's judgment." *Joseph v. Brierton*, 739 F.2d 1244, 1248 (7th Cir. 1984). Given the context of the prejudicial remarks and the district judge's assess-

ment of the jury's reaction to them, we hold that the Golden Rule argument was not reversible error.

Although the judge did overrule the City's objection to the Golden Rule argument and did not give a limiting instruction, we have noted that any prejudice can often be cured simply by a general instruction that properly informs the jury on the law of damages. *See Spray-Rite,* 684 F.2d at 1246. In the case at bar, the judge gave the jury extensive guidance on how to assess damages and warned:

> In deciding the facts of this case you must not be swayed by bias or prejudice or favor as to any party. Our system of law does not permit jurors to be governed by prejudice or sympathy or public opinion. Both the parties and the public expect that you will carefully and impartially consider all of the evidence in the case, follow the law as stated by the Court, and reach a just verdict regardless of the consequences.

Moreover, in denying the City's motion for a mistrial, the judge carefully assessed the prejudicial effect of the Golden Rule argument. She noted that counsel was not unduly emotional in making the argument, and she did not believe that the heavy damages assessed against the City were attributable to the argument. Viewed in totality, and giving great deference to the superior vantage point of the trial judge in assessing the context and effect of the Golden Rule argument, *see Arnold,* 681 F.2d at 197, the argument was not so egregious that the judge abused her discretion in refusing to cure the error by ordering a new trial.

## III

The City next contends that the damages award was so excessive as to require either a reversal for a new trial or a remittitur. Whether a damage award is excessive is a recurring problem and has been an issue in several recent cases in this Circuit. With those cases in mind, we discuss the test that is required and then its application to the instant case.

■ The test is severe. Trial judges may vacate a jury verdict for excessiveness only if it is "monstrously excessive" or if there is "no rational connection between the evidence on damages and the verdict," *Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 971 (7th Cir.1983), and appellate review is governed by the extremely limited abuse of discretion standard, *see Galard v. Johnson,* 504 F.2d 1198, 1199 (7th Cir.1974). Recently, this court added an additional element to the equation where the case under review is but one of a series of similar cases that establish a trend in damage awards: comparability. *Levka v. City of Chicago,* 748 F.2d 421, 425 (7th Cir.1984) ("One factor we must consider in determining whether to set aside an award is whether the award is out of line compared to other awards in similar cases."); *Phillips v. Hunter Trails Community Assoc.,* 685 F.2d 184, 190 (7th Cir. 1982).

At least ten strip search suits have been filed against the City in the Northern District of Illinois and tried before a jury. In those cases, the jury returned the following damage awards: $3,300,[1] $15,000,[2] $15,-000,[3] $25,000,[4] $25,000,[5] $30,000,[6] $45,000,[7]

---

**1.** *Blanca v. City of Chicago,* No. 82 C 1911 (N.D. Ill.1982).

**2.** *Susan B. v. City of Chicago,* No. 83 C 228 (N.D.Ill.1983).

**3.** *Stella S. v. City of Chicago,* No. 82 C 1912 (N.D.Ill.1983), *appeal dismissed,* No. 84–1118 (7th Cir.1984).

**4.** *Jane Does v. City of Chicago, No.* No. 79 C 789 (N.D.Ill.1982) (plaintiff Mary Beth G. in class

action suit), *affirmed sub nom. Mary Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir.1983).

**5.** *Id.* (plaintiff Sharon N. in class action suit).

**6.** *Tikalsky v. City of Chicago* (N.D.Ill.1982), *affirmed sub nom. Mary Beth G., supra,* 723 F.2d 1263.

**7.** *Mary T. v. City of Chicago,* No. 83 C 2942 (N.D.Ill.1984).

$50,000 (reduced as excessive to $25,000),[8] $60,000,[9] and $112,000 in the case at bar.

The manner of the searches depicted in those cases that were reviewed or discussed on appeal, *see Levka*, 748 F.2d at 421; *Mary Beth G.*, 723 F.2d at 1267, 1275–76, were quite similar, although some searches were more aggravated than others.[10] For example, Mary T., *see supra* note 7, alleged that the matron felt her breasts and threatened that if she did not comply with the search, male officers would be called in to assist. *See Levka*, 748 F.2d at 425 (discussing case). Stella S., *see supra* note 3, was subjected to offensive touching and probing of her orifices by a police officer, and Susan B., *see supra* note 2, was forced to squat five times despite her recent hysterectomy. *See Levka*, 748 F.2d at 426 (discussing cases). Hinda Hoffman, *see supra* note 9, testified that two male police officers were within view when she was strip searched, and a group of prostitutes jeered at her as the search was conducted. *See Mary Beth G.*, 723 F.2d at 1275 (discussing case). Mary Beth G., *see supra* note 4, also testified that she was being viewed by male police personnel during her search. *See Mary Beth G.*, 723 F.2d at 1275.

Joan's search was not different in kind from these aggravated searches, which had resulted in damage awards ranging from $15,000 to $60,000. She was required to undress, lift each breast, bend over and spread her buttocks and vagina. Indeed, unlike some of the other litigants, Joan was not touched during the search, nor was she searched within the view of anyone other than female detention personnel. None of the plaintiffs in the strip search cases brought to us on appeal have alleged any physical impairment as a result of the searches nor did Joan W. allege such impairment. They did, however, as did Joan W., allege resulting psychic trauma and emotional distress. This court in *Mary Beth G.*, 723 F.2d at 1275, described some of the trauma endured by four plaintiffs: *"inter alia*, instances of shock, panic, depression, shame, rage, humiliation, and nightmares, with lasting effects on each woman's life." Additionally we observed that "each woman still thinks about the strip search, and each woman's attitudes and relationships with others has been colored by the experiences." *Id.*

In *Levka*, 748 F.2d at 423, we also described the emotional trauma claimed by Maria Levka, *see supra* note 8, as a result of her strip search:

> [P]laintiff testified that in the weeks following the strip search she continued to be frightened and became afraid to go out alone at night. She testified that if she tried to go out alone, she would return home and fall apart. According to plaintiff, her fears became so pronounced that she consulted a psychiatrist one month after the search.... [P]laintiff claims that she continues to be afraid and that even now she will not go out alone at night. In fact, she testified that she no longer sees movies or attends parties, the ballet, or the theatre.

---

**8.** *Levka v. City of Chicago*, No. 83 C 2283 (N.D. Ill.1983), *judgment vacated as excessive*, 748 F.2d 421 (7th Cir.1984).

**9.** *Jane Does v. City of Chicago*, No. 79 C 789 (N.D.Ill.1982) (plaintiff Hoffman in class action suit), *affirmed sub nom. Mary Beth G., supra*, 723 F.2d 1263.

**10.** The usual procedure is described in *Mary Beth G.*, 723 F.2d at 1267:

> Although the circumstances surrounding the arrests and detentions of each of the plaintiffs-appellees in these consolidated cases are not identical, the situations involve the following common elements: each woman was arrested for a misdemeanor offense and each was subjected to the strip search policy of the

City of Chicago. That policy, as described by the City, required each woman placed in the detention facilities of the Chicago Police Department and searched by female police personnel to:

> (1) lift her blouse or sweater and to unhook and lift her brassiere to allow a visual inspection of the breast area, to replace these articles of clothing and then
>
> (2) to pull up her skirt or dress or to lower her pants and pull down any undergarments, to squat two or three times facing the detention aide and to bend over at the waist to permit visual inspection of the vaginal and anal area.

In sum, the plaintiff there claimed that she "suffered continuous and deep emotional trauma as the result of her strip search." *Id.*

The emotional distress and trauma claimed by Joan W. was not qualitatively more severe than that claimed by the four plaintiffs in *Mary Beth G.* or by Maria Levka. In other words, when the evidence of the injuries suffered by these other women is compared to that claimed by Joan, there is no difference in kind among them. Joan testified that she never sought psychiatric assistance or other counseling following her postarrest experience. Although she alleged that her social contacts diminished, there is little evidence of this fact in the record. Subsequent to the strip search, Joan became the chief resident at the hospital where she was employed and is now successfully practicing medicine.

 In conclusion, we are of the view that considering the totality of the evidence and comparing this case to the other similar cases brought against the City, the jury award of $112,000 for damages is flagrantly extravagant and out of line with the other strip search cases. However reprehensible the City's conduct, the jury does not have discretion to award what are essentially punitive damages where no punitive damages are pled or permitted. *Cf. City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (municipalities are immune from punitive damages in section 1983 actions). Nor should we presume extensive compensatory damages as a matter of law. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). "Damages are awarded in § 1983 actions to compensate individuals for injuries resulting from the deprivation of their constitutional rights," *Busche v. Burkee,* 649 F.2d 509, 518 (7th Cir.1981), and where the award is not rationally proportionate to awards assessed in similar cases for injuries that are no different in kind from those suffered by the plaintiff, then the award is excessive, *cf. Abernathy,* 704 F.2d at 971 (test is whether there is a "rational connection between the evidence on damages and the verdict").

On the other hand, we do not believe that the evidence of injury is so slight as to justify an entry of remittitur to the $25,000 base figure established in *Levka.* There are aggravating circumstances in the case at bar that were absent in *Levka* —particularly the taunting of Joan—and although these circumstances are not different in kind from those in the other aggravated cases, a jury could rationally find some differences in degree given the evidence of Joan's peculiar sensitivities to this kind of abuse. We believe the jury could rationally award damages to Joan above the record $60,000 figure awarded Hoffman, *see supra* note 9. Accordingly, we hold the damages excessive only to the extent they exceed $75,000.

The district court's order is reversed, the judgment is vacated, and the cause is remanded to the district court with directions to hold a new trial unless plaintiff accepts the entry of a remittitur reducing the award to $75,000. Circuit Rule 18 shall not apply. Each party shall bear its own costs.