# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1185

_____

Alice McCabe; Christine Nelson,                *
                                               *
              Plaintiffs - Appellants,         *
                                               *
       v.                                      *
                                               *
Michael Parker,                                *
                                               *
              Defendant - Appellee,            *
                                               *
Iowa State Patrol,                             *
                                               *
              Defendant,                        *
                                               *
W. Ralph Basham; Tom Ridge;                    *
Bruce Macaulay; Holly Michael;                 *
United States of America; Michelle             *
Mais, Deputy Sheriff; Linn County,             *
                                               *
              Defendants - Appellees.          *

              _____

No. 09-1847                            Appeals from the United States
              _____             District Court for the
                                      Northern District of Iowa.

Alice McCabe; Christine Nelson,                *
                                               *
              Plaintiffs - Appellants,         *
                                               *
       v.                                      *
                                               *

Michael Parker; Iowa State Patrol;      *
W. Ralph Basham; Tom Ridge;             *
Bruce Macaulay; Holly Michael;          *
United States of America,                *
                                         *
            Defendants,                  *
                                         *
Michelle Mais, Deputy Sheriff,          *
                                         *
            Defendant - Appellee,        *
                                         *
Linn County,                             *
                                         *
            Defendant.                   *

_____

Submitted: October 20, 2009
Filed: June 30, 2010

_____

Before WOLLMAN, MURPHY, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

Alice McCabe and Christine Nelson attended a 2004 Republican campaign rally in Cedar Rapids, Iowa, to protest President Bush's position on the Iraq war. After being arrested for trespass and subjected to a strip and visual body cavity search at the Linn County jail, McCabe and Nelson brought suit against several federal, state, and county officials alleging violations of the First and Fourth Amendments. Most of the claims were dismissed before trial. The case went to trial against one secret service agent on claims arising from the alleged unlawful arrests and against the county jailer who conducted the strip and visual body cavity searches.

The jury found against McCabe and Nelson on the arrest claims. The jury found in favor of McCabe and Nelson on the search claims and awarded $750,000 in damages. The district court granted the jailer's request for a new trial on the grounds the $750,000 award was excessive and gave McCabe and Nelson the option of accepting a remittitur in the amount of $75,000, which they rejected. A second jury awarded $55,804. McCabe and Nelson filed timely appeals raising issues arising from the pre-trial dismissal of some claims, the first trial, the second trial, and their post-trial requests for attorney fees. We affirm in part, reverse in part, and remand.

I

On September 3, 2004, the Republican National Committee (RNC) held a campaign rally at the Noelridge Park in Cedar Rapids, Iowa, supporting the candidacies of President George W. Bush and other Republican candidates for federal and state offices in the November 2004 elections. Two days prior to the rally, Joel Miller, the chairman of the Linn County Democratic Party, arranged to hold a protest at the pool house within the park, obtaining permission from the Cedar Rapids Police Department to do so. Miller sent an email to various registered Democrats in eastern Iowa, inviting "PEACEFUL PROTESTORS" to come to the pool house and protest President Bush's visit. America Coming Together, a political action group, sent a similar email to others including Christine Nelson, a schoolteacher (now retired), inviting her to come to the pool house during the rally to protest the Iraq war. Nelson decided to attend the rally and invited one of her friends, Alice McCabe, a retired schoolteacher, to join her. McCabe accepted the invitation and invited another friend, Barb Hannon, to join them. The three women agreed to meet with fellow demonstrators near the pool house on the day of the rally.

In preparation for the rally, federal secret service agents implemented security measures to ensure the safety of President Bush and other rally attendees. In cooperation with state and local law enforcement officials, the secret service

constructed physical barriers between the park and adjoining rights-of-way, imposed restrictions upon entry to the park, and imposed restrictions on vehicular and pedestrian use of adjoining rights-of-way. A parking lot in the southwest corner of the park[1] was set up as the secure entrance, with snow fences constructed around the rest of the park. Rally attendees could either enter the parking lot on foot or take a shuttle bus into the parking lot, and then pass through metal detectors before entering the park itself. With the exception of law enforcement vehicles, shuttle buses were the only vehicles allowed on 42nd Street NE, the street bordering the south side of the park.

The restrictions the secret service placed on pedestrian traffic on the roads and sidewalks adjacent to the park generally prohibited people from standing or congregating on the roads or sidewalks so as not to disrupt the flow of shuttle buses or pedestrians into the rally, impede emergency evacuation, or make it more difficult for law enforcement to monitor the crowd for potential threats. Members of the general public were not allowed to stop and stand in or around the shuttle bus entrance on the park-side sidewalk of 42nd Street NE. In addition, only moving pedestrians were allowed on the sidewalk across the street from the park on 42nd Street NE.

The pool house is on the south edge of the park, flanked by the parking lot to the west and tennis courts to the east. Significantly, the secret service designated the pool house as a command center that would be off limits to all but authorized personnel, requiring a change in the protestors' plans. The afternoon before the rally, Steven O'Konek, the Cedar Rapids police officer who had given permission for the protest at the pool house, emailed Joel Miller to notify him the entire park had been designated a secure area, including the pool house. Officer O'Konek assured Miller, however, "[t]here will be a location for your demonstration," and that law enforcement

---

[1]President Bush was to speak from a temporary stage set up in the opposite (northeast) corner of the park.

officers would direct demonstrators to a location suitable for the planned protest. The southwest corner of Council Street NE and 42nd Street NE was made available as a place for protestors to gather.

Nelson, McCabe, and Hannon did not learn about the change in plans regarding the pool house. The three women were also unaware of the restrictions on pedestrian traffic on the sidewalks and streets adjacent to the park, because the restrictions were not posted for public view. On the day of the rally, the three women approached the southwest corner of the park on foot, walking on the sidewalk across the street from the park on 42nd Street NE. McCabe carried an 8 1/2" x 11" piece of paper affixed to a small yard sign. The sign said "Bad War No More" and a had a "W" with a slash through it. Nelson and Hannon did not have protest signs, but Nelson displayed a small "Kerry-Edwards" button and Hannon wore a small "Kerry" button.

Still planning to meet other protestors at the pool house, the three women crossed 42nd Street NE directly south of the tennis courts. They then turned and doubled back, walking westward on the park-side sidewalk, all the while looking for the pool house demonstration and their fellow protesters. Hannon got separated from McCabe and Nelson when she met an acquaintance; the other two women continued walking, finally stopping next to the shuttle bus entrance believing they could meet fellow protesters there.

Secret Service Agent Michael Parker was posted near the shuttle bus entrance in plainclothes. He saw McCabe standing next to the bus entrance and told her to move off the sidewalk. Nelson heard Parker as well, and both women moved off the sidewalk and onto the strip of grass between the sidewalk and the street, still standing close to the shuttle bus entrance. After the two women had been standing in this location for several minutes, Parker told McCabe to move down the street or across the street. A few other people were near the bus entrance, including a man with a bucket collecting donations on behalf of Republicans. McCabe, feeling she was being

singled out, asked Parker whether he was going to tell everyone else to move as well. Parker then radioed for assistance. Secret Service Agent Bruce Macaulay, also in plainclothes, approached McCabe and Nelson and ordered them to move. The two women questioned why they were not permitted to stay where they were. After confronting McCabe three times, Macaulay made the decision to arrest the women for trespass if they did not move within thirty seconds. After thirty seconds passed, Iowa State Troopers Rich Busch and Troy Bailey, who along with Sergeant Jim Loveland had also responded to Parker's request for assistance and had also directed McCabe and Nelson to move several times, finally arrested the two women.

After being arrested and charged with simple misdemeanor trespass under Iowa law, the two women were taken to the Linn County jail. At the jail, despite the fact neither woman was suspected of hiding weapons or contraband and had only been charged with a simple misdemeanor, Linn County Deputy Sheriff Michelle Mais conducted a "full strip search" of the two women in violation of jail policy.[2] The "full strip search" required the two women to strip naked and included a visual body cavity search. In a visual body cavity search, detainees must bend over and spread their buttocks and allow an officer to inspect their rectal area. The visual body cavity search also included an inspection of the women's vaginas. While Nelson was searched, the top half of a Dutch door to the room in which the search took place was open, and male jailers passed by the open door during the search.

Because the rally organizers had never obtained formal approval from the City of Cedar Rapids to hold the rally in the park, or to close the adjacent public streets and

---

[2]The federal officials responsible for the women's arrest at the rally had no authority over the Linn County Jail, no knowledge of the jail's practices, and no knowledge of what type of search, if any, might be performed on the two women following their arrests.

sidewalks for the exclusive use of the rally,[3] there was no lawful basis for the trespass charges against McCabe and Nelson.  Three months after the rally, the Linn County Attorney dismissed the trespass charges.

McCabe and Nelson brought suit in federal district court against a number of federal, state, and county officials, including Secret Service Agents Macaulay and Parker, Iowa State Troopers Busch and Bailey, and Linn County Jailer Michelle Mais. The two women asserted various violations of their First and Fourth Amendment rights arising out of the allegedly unlawful arrest and unlawful strip and body cavity search.  McCabe and Nelson also alleged a nationwide conspiracy on the part of the Bush Administration to target and suppress protesters for exercising their First Amendment rights to oppose Bush's policy on the Iraq war.

McCabe and Nelson sought to add as defendants Tom Ridge (then the Secretary of the Department of Homeland Security) and W. Ralph Basham (then the Director of the United States Secret Service) for their part in the alleged conspiracy.  These two defendants moved to dismiss the claims against them for lack of personal jurisdiction. McCabe and Nelson opposed the motion and requested jurisdictional discovery, supporting their response with several newspaper articles and hundreds of pages of internet research showing the existence of a number of lawsuits pending around the United States involving the alleged unlawful arrests of protesters at Bush campaign rallies.  The district court granted the motion to dismiss Ridge and Basham without allowing McCabe and Nelson to conduct discovery.

Most of the claims brought by McCabe and Nelson were dismissed prior to trial, including Federal Tort Claims Act (FTCA) claims brought directly against the United States. The district court dismissed the FTCA claims as a sanction against

---

[3]Under Iowa law, "public ways and grounds may be temporarily closed by resolution," Iowa Code § 364.12(2)(a), but the RNC did not seek such a resolution from the City prior to the rally.

McCabe and Nelson on the grounds they filed an inadequate brief in response to the government's motion to dismiss. The Iowa state troopers who executed the arrest reached a settlement agreement prior to trial, and testified as witnesses rather than parties. Mais, the jailer who conducted the strip and visual body cavity searches, conceded liability[4] and only contested damages. The district court concluded Agent Macaulay was not responsible for any damages that arose from the unlawful searches. Thus, the only claims that proceeded to trial were the First and Fourth Amendment claims against Agent Macaulay arising from the allegedly unlawful arrests, and the damages portion of the Fourth Amendment claims against Mais arising from the strip and visual body cavity searches at the jail.

At trial, McCabe and Nelson described the humiliation and trauma they experienced as the result of being forced to stand naked in front of a complete stranger and expose intimate parts of their body. Barb Hannon bailed the two women out of jail and described them as being in "shock." Both spent the night crying. When describing the search, McCabe testified she was "horrified." She said it was "like it was happening to another person, like – like I was almost standing back watching this happen to me, because I just couldn't – I couldn't wrap my brain around what was going on." Nelson testified she was "humiliated, and I felt violated. I felt as though I had lost control of my own body. I couldn't imagine many things that would be worse." Nelson was diagnosed with depression following the arrest and search, and obtained medical treatment for her depression.

---

[4]Mais's conduct not only violated the jail's policy, but also Iowa law, see Iowa Code § 804.30 (prohibiting a strip search of a person arrested for a simple misdemeanor absent probable cause to believe the person is concealing contraband or weapons) as well as the Fourth Amendment, e.g., Jones v. Edwards, 770 F.2d 739, 740-42 (8th Cir. 1985) (concluding a strip and visual body cavity search of a person arrested for a simple misdemeanor violated the Fourth Amendment where there was no reason to suspect the detainee was harboring weapons or contraband, and discussing cases from other circuits concluding the same).

In answers to special interrogatories, the jury found Agent Macaulay reasonably believed McCabe and Nelson disobeyed a law enforcement officer's order to move and the arrests were not motivated by the two women's exercise of their First Amendment rights.[5] Based upon the jury's answers to the special interrogatories, the district court concluded the arrests were supported by probable cause and dismissed the First and Fourth Amendment claims against Agent Macaulay arising from the arrests.

At the close of the plaintiffs' case, Mais requested that a directed verdict be entered against her on the issue of liability, but argued only nominal damages should be awarded to McCabe on the grounds McCabe had not presented sufficient evidence of emotional distress arising from her unlawful search. The district court entered a directed verdict on the issue of liability, but denied the request for nominal damages against McCabe and allowed the jury to decide the amount of both McCabe's and Nelson's damages arising from the searches. The jury awarded McCabe $250,000 and Nelson $500,000 in damages.

Mais brought a post-trial motion for a new trial on the grounds the jury's damage award was excessive. The district court granted the motion, concluding the damage award was excessive and shocked the court's conscience. The district court gave McCabe and Nelson the option of accepting a 90% remittitur in the amount of $75,000 in lieu of a new trial, which they rejected. Mais then made an offer of judgment under Rule 68 of the Federal Rules of Civil Procedure in the same amount as the district court's remittitur, which the two women also rejected. The district court

---

[5]The special interrogatories were crafted consistent with the process set forth in Peterson v. City of Plymouth, 60 F.3d 469, 475-76 (8th Cir. 1995), involving a Fourth Amendment unlawful arrest claim. Peterson indicates the jury should be asked to resolve discrete factual questions to determine what the officers knew at the time of an arrest, with the court thereafter deciding the legal question of probable cause (and, in this case, infringement of the First Amendment as well).

set the date for a second trial just three weeks after granting the motion for a new trial. Because of the short notice, McCabe and Nelson filed a motion for a continuance setting forth their counsels' scheduling conflicts. The district court denied the request for a continuance. In the second trial, the jury awarded $10,002 in damages to McCabe, and $45,802 in damages to Nelson. McCabe and Nelson brought post-trial motions following the second trial, which the district court denied.

Finally, McCabe and Nelson moved for an award of attorney fees as prevailing parties under 42 U.S.C. § 1988. As to the fees incurred up to and through the first trial, McCabe and Nelson conceded 60% of their total fees should be attributed toward the unsuccessful claims involving their arrests, and argued the remaining 40% should be awarded for their success on the search claims. Mais opposed the request, arguing 85% of the total fees should be allocated to the unsuccessful arrest claims, and only 15% to the successful search claims. The district court agreed with Mais and awarded 15% of the fees incurred through the first trial.

With respect to the fees incurred during the second trial, the district court awarded $7,532.95 out of a requested amount of $65,798.40. The amount awarded by the district court equaled the amount incurred prior to Mais's Rule 68 offer of judgment. The district court denied the request for fees incurred after the Rule 68 offer of judgment because the amount awarded by the second jury was less than the offer of judgment. See City of Riverside v. Rivera, 477 U.S. 561, 580 (1986) (holding a defendant is not liable for § 1988 attorney fees which are incurred after a Rule 68 offer of judgment "where the judgment recovered by the plaintiff is less than the offer").

McCabe and Nelson filed timely appeals raising a host of issues with respect to claims dismissed prior to trial, the arrest claims, the unlawful search claims, and the partial award of attorneys fees.

II

A. The Arrest Claims

McCabe and Nelson challenge the adverse resolution of the First and Fourth Amendment claims arising from their arrests. The two women contend the district court (1) erred in dismissing Ridge and Basham for lack of personal jurisdiction without allowing jurisdictional discovery, (2) erred in sanctioning them by dismissing the FTCA claims against the United States, (3) erred in granting summary judgment to two individual Secret Service Agents prior to trial, (4) abused its discretion by refusing to allow State Troopers Busch and Bailey to be treated as adverse witnesses and by preventing the troopers' status as settling parties from being introduced into evidence to establish bias, (5) erred in concluding probable cause supported the arrest based upon the jury's answers to the special interrogatories, (6) committed instructional error on their First Amendment claims, and (7) erred in failing to submit to the jury a conspiracy claim brought pursuant to 42 U.S.C. § 1985(3).

Lack of probable cause is a necessary element of all the claims McCabe and Nelson brought arising from the allegedly unlawful arrests. See Devenpeck v. Alford, 543 U.S. 146, 152 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."); Williams v. City of Carl Junction, Missouri, 480 F.3d 871, 876 (8th Cir. 2007) (holding that a plaintiff asserting a Bivens or § 1983 claim for an alleged unlawful citation arising from the exercise of First Amendment rights must plead and prove a lack of probable cause for the underlying charge pursuant to the Supreme Court's decision in Hartman v. Moore, 547 U.S. 250 (2006)). As a consequence, most of the challenges to the disposition of specific arrest-related claims (and the defensive arguments advanced by the appellees) will be rendered moot if the arrests were supported by probable cause. We therefore focus our attention on the issues related to probable cause. Before we do that, however, we

must address the evidentiary issues raised by McCabe and Nelson with respect to the sequence of events surrounding the arrests, because a change in that evidence may have affected the jury's answers to the special interrogatories.

McCabe and Nelson raise two evidentiary issues involving the testimony of Iowa State Troopers Busch and Bailey with respect to the sequence of events surrounding the arrests. First, they contend the district court should have allowed them to ask leading questions during the troopers' direct examinations because they were adverse witnesses, and the district court improperly disrupted the flow of the direct exam with *sua sponte* comments at a critical juncture. Second, they contend the jury should have been told the troopers were defendants who had settled. We review these evidentiary issues under an abuse-of-discretion standard. Gill v. Maciejewski, 546 F.3d 557, 562 (8th Cir. 2008).

The exact location where the two women were arrested was a hotly contested fact at trial. The two women had been instructed by secret service agents and local law enforcement officers to move away from the shuttle bus entrance, and a primary issue for the jury was whether the two women had disobeyed the orders. McCabe and Nelson contend they obeyed the request to move by retreating from the park side of 42nd Street NE, and into or across the street to the south. A video taken by a bystander, and a still photograph reproduced from the video, depict Trooper Busch holding Nelson by the arm after her arrest. Significantly, Nelson is standing on the south side of the street at the time, and a witness testified the photo shows the location where Nelson was arrested. Another photo shows McCabe in the middle of the street after her arrest. The photos discredited testimony given by the troopers marking the location of the arrests on the park side of the street. McCabe and Nelson further contend the photos conflicted with the troopers' testimony that McCabe and Nelson could have avoided being arrested if they had just moved south across the street, because the photos showed they already had moved south across the street by the time they were arrested.

McCabe and Nelson called the troopers as witnesses in their case-in-chief. During the troopers' direct examination, at times when plaintiff's counsel was attempting to impeach the troopers regarding the location of the arrests, the district court instructed plaintiff's counsel to avoid leading questions and denied counsel's request to treat the first testifying trooper (Bailey) as an adverse witness. McCabe and Nelson contend these evidentiary rulings were an abuse of discretion and had a substantial impact on the jury's answer to the probable cause inquiry. We disagree.

A similar challenge to a district court's *sua sponte* instructions to avoid leading an adverse witness on direct examination was addressed in Scenic Holding, LLC v. New Board of Trustees of Tabernacle Missionary Baptist Church, Inc., 506 F.3d 656 (8th Cir. 2007). Scenic Holding explained that under Federal Rule of Evidence 611(c) "[t]he standard, acceptable, and preferred procedure is to permit counsel to lead an adverse or hostile witness on direct examination" but that the Rule "is permissive and must be read in context with the trial court's general authority and discretion to control the conduct of the trial." Id. at 664. The court concluded the impact of the district court's *sua sponte* instructions was "minuscule" and did not affect the appellant's substantial rights. Id. We reach the same conclusion here.

A review of the trial transcript indicates plaintiffs' counsel was able to adequately present the conflicting testimony regarding the exact location of the arrests, including the discredited testimony given by the two troopers, despite the district court's instruction to avoid leading questions during direct examination. Significantly, the troopers also testified during Agent Macaulay's case-in-chief, and counsel had a full opportunity to conduct cross examination using leading questions. Thus, any limitations placed on the questions during the plaintiffs' case-in-chief had little impact on the overall trial.

Moreover, even assuming the comments had some impact on counsel's ability to discredit the officers regarding the exact location of the arrests, we do not believe

the actual location of the arrests is as critical as McCabe and Nelson contend. Although the two women testified they complied with the requests to move across the street, multiple secret service agents and local law enforcement officers testified both women refused repeated requests to move over an extended period of time, interrupting the officers by claiming other people were not being asked to move and insisting they had a right as taxpayers to be on a public sidewalk. The jury heard all the conflicting evidence on the disputed sequence of events surrounding the arrests, and ultimately decided McCabe and Nelson disobeyed a law enforcement officer's order to move. In other words, even if the evidence showed McCabe and Nelson eventually moved away from the park and across the street before they were actually arrested, the jury was free to decide they had already disobeyed an order to move by then.

McCabe and Nelson also complain the district court improperly excluded any reference to their settlement with the troopers or the troopers' status as former parties to the lawsuit. While settlement evidence of this type is generally prohibited, settlement evidence can be used to prove a witness's bias or prejudice. Fed. R. Evid. 408(b); see also Hennepin County v. AFG Indus., Inc., 726 F.2d 149, 152-53 (8th Cir. 1984). Prior to trial and before the troopers settled, McCabe and Nelson filed a motion in limine seeking to have all settlement negotiations with the defendants excluded from trial. The district court granted the motion. After settling with the troopers, McCabe and Nelson changed course and sought to introduce evidence of the settlement, purportedly to show the troopers' bias. The district court declined to change its ruling on the prior motion in limine, ultimately excluding any evidence related to the settlement under Federal Rule of Evidence 403. See Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 310 (8th Cir. 1997) (indicating evidence may be excluded under Rule 403's balancing test even assuming it is relevant and admissible under Rule 408). In this case, counsel was allowed to ask other questions related to the troopers' alleged bias, and we perceive no abuse of the district court's discretion in excluding the settlement evidence under Rule 403.

We turn next to the probable cause issue. McCabe and Nelson challenge the district court's conclusion that the jury's answers to the special interrogatories support a finding of probable cause as a matter of law. The district court's conclusion there was probable cause to support the arrests is reviewed de novo. United States v. Quiroga, 554 F.3d 1150, 1154 (8th Cir. 2009); see also United States v. Brunette, 256 F.3d 14, 17 (1st Cir. 2001) (explaining de novo review of probable cause determinations is "no different where First Amendment concerns may be at issue.").

The special interrogatory posed to the jurors asked:

> In light of the information available to Defendant Bruce Macaulay at the time of the arrest of Plaintiff Alice McCabe [and Christine Nelson], did Defendant Bruce Macaulay have a reasonable basis to conclude that Plaintiff Alice McCabe [and Christine Nelson] had disobeyed a law enforcement officer's order to move?

App. at 174, 176. The jury answered "Yes" to this question with respect to both Alice McCabe and Christine Nelson. Id.

As noted above, there was no lawful basis for the trespass charges actually brought against McCabe and Nelson. That fact has no bearing on whether the arrests comported with the Fourth Amendment, as long as there was probable cause to believe some criminal offense had been committed. See Devenpeck, 543 U.S. at 153 (indicating an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."). In determining whether probable cause supported an arrest, we consider "the totality of the circumstances as set forth in the information available to the officers at the time of the arrest." United States v. Kelly, 329 F.3d 624, 628 (8th Cir. 2003) (citing Illinois v. Gates, 462 U.S. 213, 230-39 (1983)). Furthermore, because Agent Macaulay is entitled to qualified immunity if he had a mistaken but objectively reasonable belief McCabe and Nelson had committed a criminal offense, McCabe and

-15-

Nelson lose even if there was merely *arguable* probable cause to support the arrests. Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008).

The district court determined the jury's answers to the interrogatories supported a finding of probable cause for the arrests under one or more of five separate federal and state statutes, specifically: 18 U.S.C. § 3056(d),[6] 18 U.S.C. § 1752,[7] Iowa Code § 719.1,[8] Iowa Code § 723.4,[9] and Iowa Code § 321.229.[10]

---

[6]Section 3056(d) states:

Whoever knowingly and willfully obstructs, resists, or interferes with a Federal law enforcement agent engaged in the performance of the protective functions authorized by this section [protecting the President] or by section 1752 of this title shall be fined not more than $1,000 or imprisoned not more than one year, or both.

[7]Section 1752 states in relevant part:

It shall be unlawful for any person or group of persons . . . willfully and knowingly to enter or remain in . . . any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting.

[8]Section 719.1 of the Iowa Code states in relevant part:

A person who knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer ... commits a simple misdemeanor.

[9]Section 723.4 of the Iowa Code states in relevant part:

A person commits a simple misdemeanor when the person does any of the following . . . [w]ithout authority or justification, the person obstructs any . . . sidewalk . . . with the intent to prevent or hinder its lawful use by

-16-

We conclude there was arguable probable cause to arrest McCabe and Nelson for violating 18 U.S.C. § 3056(d), which prohibits a person from resisting a federal law enforcement agent who is performing protective services for the President. Cf. United States v. McPherson, 21 F.3d 429 (6th Cir. 1994) (unpublished table disposition) (1994 WL 100261, at *1-2) (affirming the conviction of a woman under § 3056(d) for repeatedly refusing a secret service agent's request to move from a restricted area while he was performing protective services for former First Lady Barbara Bush). Notwithstanding the secret service's failure to publicly post the restrictions on pedestrian traffic on the sidewalks and streets adjacent to the park (which was unfortunate), it is clear the area near the shuttle bus entrance had been designated as a restricted area to ensure the safety of the President. McCabe and Nelson were in the restricted area, and the jury found that Agent Macaulay had a reasonable basis to conclude McCabe and Nelson had disobeyed a law enforcement officer's order to move from the area. The totality of the circumstances present in this case supports a finding of arguable probable cause that the two women violated § 3056(d).[11]

The remaining challenges to unfavorable rulings on the arrest claims are mooted by the presence of arguable probable cause, including the claim the district court committed instructional error on the First Amendment claims. See Hartman, 547 U.S. at 265-66 (requiring absence of probable cause to be proven as an element of a

others.

[10]Section 321.229 of the Iowa Code states: "No person shall willfully fail or refuse to comply with any lawful order or direction of any peace officer invested by law with authority to direct, control, or regulate traffic." In addition, section 321.1(84) includes "pedestrians" in the definition of "traffic."

[11]Having concluded there was arguable probable cause that the two women violated § 3056(d), it is unnecessary to address whether there was probable cause or arguable probable cause to believe the women violated any of the other federal or state statutes relied upon by the district court.

retaliatory-prosecution case); Williams, 480 F.3d at 876 (applying Hartman to a First Amendment claim where the plaintiff alleged he received citations in retaliation for exercising his First Amendment rights); see also Beck v. City of Upland, 527 F.3d 853, 863-64 (9th Cir. 2008) (indicating a claim alleging an unlawful arrest in retaliation for exercising First Amendment rights can only go forward under Hartman "if a plaintiff can prove that the officials secured his arrest or prosecution without probable cause **and** were motivated by retaliation against the plaintiff's protected speech") (emphasis added).

In sum, we find no reversible error with respect to the disposition of the claims McCabe and Nelson brought arising from their arrests.

## B. The Search Claims

McCabe and Nelson also raise a number of challenges to the manner in which the search claims were resolved. The two women contend the district court (1) erred in concluding Agent Macaulay could not be held liable for damages arising from the unlawful strip and visual body cavity search at the jail, (2) abused its discretion in granting the jailer's request for a new trial or, in the alternative, requiring them to accept a remittitur in the amount of $75,000, (3) abused its discretion by denying their request for a continuance before the second trial, and (4) abused its discretion by refusing to grant their request for a new trial following the second trial.

McCabe and Nelson first contend the district court erred in granting summary judgment to Agent Macaulay on the claim that he, in addition to Mais, could be held liable for damages arising from the unlawful search. We review a grant of summary judgment de novo. Rand Corp. v. Yer Song Moua, 559 F.3d 842, 845 (8th Cir. 2009). One of the premises for the claim that Macaulay could be held liable for the damages the two women suffered at the jail following their arrests is that the arrests themselves violated the Fourth Amendment. From this premise, McCabe and Nelson contend

there was a causal link between the unconstitutional arrests and any damages later caused by the unlawful strip and visual body cavity searches. We do not need to address this causation argument, however, because we have already concluded the women's arrests did not violate the Fourth Amendment. Because Agent Macaulay did not commit a constitutional violation in arresting the two women, it necessarily follows that he cannot be held liable for any damages arising from the unlawful searches that followed the arrests.

McCabe and Nelson next contend the district court abused its discretion in granting Mais's motion for a new trial on the grounds the $750,000 damage award was excessive, and in remitting the award to $75,000. We review a district court's conditional grant of a new trial, and offer of a remittitur, for an abuse of discretion. Dominium Mgmt. Servs., Inc. v. Nationwide Hous. Group, 195 F.3d 358, 366 (8th Cir. 1999). Assuming the district court did not abuse its discretion in granting a new trial on the grounds the verdict was excessive, we must also determine the propriety of the amount of the remittitur offered. "[T]he standard we will apply in determining whether there was an abuse of discretion in ordering the remittitur is whether the remittitur was ordered for an amount less than the jury could reasonably find." Slatton v. Martin K. Eby Const. Co., Inc., 506 F.2d 505, 508-09 (8th Cir. 1974).

McCabe and Nelson contend the district court improperly determined the $750,000 award was excessive. In support of their contention, the two women point to a number of damage awards comparable to or larger than $750,000 in cases generally involving claims for emotional distress, but not necessarily cases involving unlawful strip and body cavity searches. McCabe and Nelson further contend it was improper for the district court to judge the excessiveness of this award by comparing it to damage awards in other cases involving unlawful strip and visual body cavity searches, because we have said "comparisons to other jury verdicts are often not particularly helpful" in claims involving noneconomic damages. Herold v. Burlington N., Inc., 761 F.2d 1241, 1248 (8th Cir. 1985).

The district court justified its decision to use a damage comparison approach on the grounds this particular case was a "garden variety" strip and body cavity search case without any particularly unique or egregious facts. Although we have said a damage comparison approach is often not helpful in claims involving noneconomic damages, we have never prohibited the practice. In some cases, where the facts are not easily comparable to the facts of other cases, the use of a damage comparison approach may be an abuse of discretion. We do not, however, believe that to be true here.

McCabe and Nelson have not identified any particularly egregious or unique facts which would make this case difficult to compare to the facts of other cases involving an unlawful strip and body cavity search. We do not mean to downplay the emotional distress that arises from being subjected to an unlawful strip and body cavity search. As the district court noted, however, the claims brought by McCabe and Nelson were solely for the emotional distress that would naturally arise in every such case. Neither McCabe nor Nelson presented evidence, for example, regarding lost wages, loss of consortium, or loss of earning capacity. Moreover, while Nelson offered testimony from a physician regarding the diagnosis of depression and treatment she received following her arrest and the search, McCabe did not.[12] We therefore find no abuse of discretion in the district court's determination this was a garden variety case, or in its decision to use a damage comparison approach.

Likewise, we find no abuse of discretion in the district court's determination the damage award was excessive. As the district court further noted, McCabe and Nelson

_____

[12]The difference between the $250,000 the jury awarded to McCabe and the $500,000 awarded to Nelson is likely explained by the medical treatment Nelson received following the traumatic experience (while McCabe did not present evidence of medical treatment) as well as the fact that the Dutch door was open while Nelson was searched and male jailers passed by the open door (while that was not the case with McCabe).

were unable to cite to any case in which a court upheld a verdict this large solely for the emotional distress associated with an unlawful strip and body cavity search. As a consequence, we find no reversible error resulting from the district court's decision to grant a new trial and offer a remittitur.

Having determined there was no abuse of discretion in granting a new trial and offering a remittitur, we must still address whether the district court abused its discretion in remitting the combined award of $750,000 down to $75,000, a reduction of 90%.

Once the district court decided to implement a damage comparison approach, it was incumbent upon the district court to follow the rules that apply to such an approach. Our circuit (as well as others) requires remittiturs to comport with what is often referred to as the maximum recovery rule. Under the maximum recovery rule, when a district court remits a jury award, the remitted amount cannot be "for an amount less than the jury could reasonably find." Slatton, 506 F.2d at 509; see also Thomas v. Texas Dept. of Criminal Justice, 297 F.3d 361, 369 (5th Cir. 2002) (indicating damages can be remitted "only to the maximum amount the jury could have awarded" pursuant to the maximum recovery rule).[13]

The courts can look "to past similar awards [and if] the verdict falls within the range established by previous awards . . . we will uphold the decision." Thomas, 297

_____

[13]We cite Thomas, a Fifth Circuit case, because we followed the Fifth Circuit's approach when we adopted the maximum recovery rule. See Slatton, 506 F.2d at 509 (citing Gorsalitz v. Olin Mathieson Chemical Corp., 456 F.2d 180 (5th Cir. 1972)). The Fifth Circuit also employs a multiplier when comparing similar damage awards, see, e.g., Salinas v. O'Neill, 286 F.3d 827, 831 & n.6 (5th Cir. 2002), which we have not to date adopted, and do not adopt now. Instead, we agree with the district court that adjusting for inflation when comparing past similar awards is a better approach than using a multiplier. See McCabe v. Mais, 580 F. Supp. 2d 815, 835 n.14 (N.D. Iowa 2008) (citing Virginian Ry. Co. v. Rose, 267 F.2d 312, 316 (4th Cir. 1959)).

F.3d at 369. When the verdict falls above the reasonable range, the amount can be reduced but "only if the reduction permits recovery of the *highest* amount the jury tolerably could have awarded." Langevine v. District of Columbia, 106 F.3d 1018, 1024 (D.C. Cir. 1997) (emphasis added) (internal quotation omitted). A reduction to less than the full amount a reasonable jury could award violates a party's Seventh Amendment right to a trial by jury. Id.; see also Dimick v. Schiedt, 293 U.S. 474, 486 (1935) (indicating the purpose of a remittitur is "merely lopping off" that portion of the award deemed to be excessive, thereby preserving a plaintiff's right to have a jury "determine . . . the extent of the injury by an assessment of damages.").[14]

In other words, once a district court decides to employ a damage comparison approach and thereafter identifies a range of reasonable jury awards in similar cases, it is not at liberty to remit an award to the low end of the range, or even somewhere in the middle of the range. A district court's only choice is to remit the award to the *maximum* amount identified as within the reasonable range.

In conducting its damage comparison, the district court listed a number of cases from this jurisdiction and other jurisdictions which it considered comparable. The district court appears to have identified the low end of the range as being the nominal damages approved in Hunter v. Auger, 672 F.2d 668, 672 (8th Cir. 1972), and the high end of the range as being the $75,000 awarded to one plaintiff in Joan W. v. City of Chicago, 771 F.2d 1020, 1025 (7th Cir. 1985).

---

[14]Other circuits which use the maximum recovery rule, in conjunction with a damage comparison approach, include the Second and the Seventh. See Rangolan v. County of Nassau, 370 F.3d 239, 244-47 (2d Cir. 2004); Spesco, Inc. v. Gen. Elec. Co., 719 F.2d 233, 240-41 (7th Cir. 1983) (applying the maximum recovery rule) and Joan W. v. City of Chicago, 771 F.2d 1020, 1023-25 (7th Cir. 1985) (utilizing a damage comparison approach).

McCabe and Nelson contend some of the cases identified by the district court should not have been included to determine the range of reasonable awards. For example, Hunter involved a strip and body cavity search policy applied to visitors at the Iowa Men's Penitentiary after the prison received information that drugs were being smuggled into the prison by visitors. The prison told visitors, because of the threat of smuggling, they would be subject to strip searches and body cavity searches before being allowed to visit. Visitors had the option of foregoing their visits.

Hunter is distinguishable from this case for at least two reasons. One, the prison had a legitimate penological interest in preventing drug smuggling, and thus the constitutional violation was not as severe as it was in this case, where there was no legitimate interest in subjecting McCabe and Nelson to body cavity searches. Two, the plaintiff in Hunter had the option of foregoing her visit to avoid being searched, whereas there was nothing McCabe or Nelson could do to prevent the body cavity searches in this case.

The district court did, however, identify some cases which we conclude were properly considered as comparable because they included these four characteristics: 1) the cases involved female plaintiffs, 2) arrested for minor or invalid infractions, 3) who were subjected to both strip and body cavity searches, and 4) the damages were solely for the emotional distress generally associated with an unlawful strip and body cavity search. One of the cases both parties agree the district court properly identified as comparable was Joan W., which involved a female plaintiff unlawfully subjected to a strip and body cavity search following a traffic arrest which occurred on January 28, 1978. 771 F.2d at 1021, 1025.

Significantly, Joan W. was the highest amount the district court identified as within the range of reasonable awards for a female in an unlawful strip and body cavity search case. Thus, it was the key case under the maximum recovery rule applied in Slatton, and therefore should have been used as the benchmark for

determining the proper amount of a remittitur. The remitted amounts the district court selected were $25,000 and $50,000 for McCabe and Nelson, respectively, below the $75,000 identified as reasonable for one plaintiff in Joan W.. The amounts selected by the district court are inconsistent with the maximum recovery rule, and reflect a clear abuse of discretion. See United States v. Gonzalez-Lopez, 403 F.3d 558, 564 (8th Cir. 2005) ("[A] district court by definition abuses its discretion when it makes an error of law.").

Moreover, the $75,000 awarded in Joan W. involved an incident that occurred on January 28, 1978. McCabe and Nelson were unlawfully searched on September 3, 2004. As the district court acknowledged, when adopting a damage comparison approach, the court must adjust the comparable awards for inflation because "[i]t does not necessarily follow, however, that a verdict deemed excessive ten years ago must be viewed similarly today. Common experience attests that the value of the dollar has been subject to consistent depreciation." Virginian Ry. Co. v. Rose, 267 F.2d 312, 316 (4th Cir. 1959); see also Mazyck v. Long Island R.R Co., 896 F.Supp. 1330, 1337 (E.D.N.Y. 1995) ("Needless to say, any comparison with damages awards in other cases must take into account the increase in the cost of living between the date of the case being compared, and the date of the jury's verdict in the instant case."). An award of $75,000 in 1978 dollars amounts to significantly more when adjusted for inflation to 2004 dollars.

Therefore, the district court's error in selecting $75,000 as the amount of the total remittitur in this case was two-fold. First, the district court selected a total amount for two plaintiffs that it identified as a reasonable amount for a single plaintiff. Second, the district court failed to calculate how much a $75,000 award for an incident that occurred in 1978 would equal for an incident that occurred in 2004 after adjusting for inflation. These errors amount to an abuse of discretion, and require us to remand this case to calculate the amount of an appropriate remittitur for both

women.[15]  After an appropriate remittitur is calculated (using $75,000 in 1978 dollars as the benchmark and adjusting for inflation), McCabe and Nelson are entitled to the choice of accepting the new remittitur or facing a third trial on the issue of the damages arising from the unlawful strip and body cavity search.[16]

## C.  Attorney Fees

Finally, McCabe and Nelson challenge the amount of attorney fees awarded by the district court pursuant to 42 U.S.C. § 1988.  McCabe and Nelson contend the district court abused its discretion (1) by attributing only 15% of the total fees incurred prior to and during the first trial to the successful search claims, and (2) by denying their request for the fees incurred in the second trial following the date of the Rule 68 offer of judgment.  We review the district court's decisions for an abuse of discretion. Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).

With respect to the fees incurred prior to and during the first trial, McCabe and Nelson conceded that 60% of the fees should be attributed to the unsuccessful arrest claims, and requested the other 40% for the successful search claims.  The district court disagreed the plaintiffs spent 40% of their time on the search claims, finding the plaintiffs focused most of their energy on the unlawful arrest claims and that little effort was required to prosecute the search claims (in part because Mais conceded liability at trial and the only remaining issue was the amount of damages).  We find no abuse of discretion in the district court's decision.  The district court ruled on many

_____

[15]In calculating the correct amount of the remittitur, it may not be possible to preserve the two-to-one ratio between the amounts the jury awarded for McCabe and Nelson, because Nelson is not entitled to more than the maximum amount the jury could have reasonably awarded, and the court may not remit McCabe's award to an amount less than the maximum amount a jury could have reasonably awarded.

[16]Having resolved the remittitur issue in favor of McCabe and Nelson, it is unnecessary to address their challenges to the second trial.

nondispositive and dispositive issues prior to trial, in addition to presiding over the first trial. Thus, the district court was in an excellent position to determine how much effort the plaintiffs had devoted to the arrest claims versus the search claims.

With respect to the fees incurred after Mais's Rule 68 offer of judgment, McCabe and Nelson contend the district court abused its discretion because it did not include the value of preserving the right to appeal in analyzing whether the second jury verdict was worth more than the amount offered by Mais in the offer of judgment. Ultimately, we need not address that issue, because we have now determined the amount of the remittitur offered in lieu of the second trial was inadequate. McCabe and Nelson were required to endure the second trial in order to preserve the right to appeal the remittitur offered by the district court. Donovan v. Penn Shipping Co., Inc., 429 U.S. 648, 649 (1977). Because we have now determined the remittitur was inadequate, McCabe and Nelson are prevailing parties and entitled to recover all reasonable fees incurred in the second trial.

## III

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

_____